**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEBRON JAMES and LBJ TRADEMARKS, LLC,<br>*Plaintiffs*,<br>-v-<br>PLAYVISION, INC. d/b/a BRON; ANISH GUPTA; and MARC ZOGHBY,<br>*Defendants*. | Case No. 1:26-cv-10078<br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs LeBron James and LBJ Trademarks, LLC, by and through their undersigned attorneys, as and for their Complaint against Defendants PlayVision, Inc. d/b/a Bron ("PlayVision"), Anish Gupta, and Marc Zoghby, allege as follows:

## NATURE OF THE ACTION

1. After more than two decades in the NBA, LeBron James has become one of the most accomplished athletes in the history of professional sports and one of the most recognizable people on the planet—a four-time NBA champion, four-time league MVP, four-time NBA Finals MVP, three-time Olympic gold medalist, and the NBA's all-time leading scorer. He is known worldwide by his first name alone, last name alone, and by nicknames that are equally and unmistakably his, including "King James" and simply "Bron."

2. With one of the most recognizable identities in the world, Mr. James has carefully protected his image. He thoughtfully selects the companies with which he works, commands tens of millions of dollars in fees for his association with a product or venture, turns down far more opportunities than he accepts, and does not lend his name to products he has not vetted. His endorsement is uniquely valuable.

3. And that is why Defendants decided to steal it all for themselves.

4. Seeking to trade on Mr. James's valuable name and reputation, Defendants called their sports-betting app "Bron" (the "Bron App"), without any connection between the word and Defendants or any feature of their app. The word "Bron" has no dictionary definition and no special meaning in the context of sports analytics, wagering, or artificial intelligence. Rather, in the context of anything sports-related, it refers to only one man—LeBron James. Since the world took notice of Mr. James as a young basketball star in Ohio to his current-day superstar status, Mr. James has been known to the world as "Bron."

5. In early November 2026, Defendants formally launched a marketing campaign for the Bron App, rolling out a video advertisement (the "Ad") built around an artificially generated version of Mr. James. In the Ad, the AI-generated version of Mr. James sits in an NBA-style locker room wearing a basketball jersey bearing Mr. James's nickname, "Bron," above the number "23"—a number associated with Mr. James and the one he currently wears on the Philadelphia 76ers—with physical traits that mimic Mr. James, down to his identifiable tattoos. Speaking in Mr. James's voice, the AI-generated Mr. James scrolls through wagers on other NBA players in Defendants' Bron App. The Ad then urges viewers to "Scroll to bet."

6. The Ad catapulted the Bron App from obscurity to controversy, with the Ad gaining a million views within a day—exactly as Defendants intended. But Mr. James has no affiliation with Defendants or their product. Defendants' intentional use of artificial intelligence to steal Mr. James's name and likeness was instead an unlawful effort to trade on Mr. James's identity to enrich Defendants.

7. And Defendants did not care that they had engaged in illegal conduct to gain notoriety for their previously unknown app. Defendants calculated that the value of that attention would exceed the cost of any legal consequences, and they treated the violation of Mr. James's

rights as a marketing expense. When Mr. James's counsel sent a cease-and-desist letter to Defendants, they used it as an opportunity to gin up additional publicity, taking down the Ad while teasing "a new name" without delivering one and daring Mr. James to file a lawsuit. They continue to use the Bron name to this day, prolonging the controversy for as long as it continues to generate attention for the Bron App and violating Mr. James's rights to serve their marketing goals. And even a belated name change now would not remedy the exploitation of Mr. James's brand and goodwill that allowed Defendants to garner these millions of views and attention in the first place.

8. Nor did Defendants care that their stunt misled consumers—that was the point. They intentionally created the false impression that Mr. James endorsed and was affiliated with their Bron App, in an effort to drive downloads and paid subscriptions. In doing so, Defendants ignored laws that require the conspicuous disclosure of any artificially generated "synthetic performer" in an advertisement.

9. Defendants' conduct was willful, deliberate, and in bad faith. Defendants selected the name "Bron" precisely to evoke Mr. James, to trade on his fame and goodwill, and to falsely suggest to the public that Mr. James endorsed or was affiliated with the Bron App. Defendants' Ad removes any doubt: to introduce their brand name to the public, Defendants put it on the back of a No. 23 basketball jersey worn by an AI-generated version of Mr. James.

10. Plaintiffs bring this action not simply to protect Mr. James's own rights. Advances in AI have lowered technological barriers and threaten to make this kind of theft and misappropriation commonplace unless the law is followed. Defendants did not need a photo shoot, a contract, or anyone's permission to create the Ad. Using generative AI, they fabricated a convincing endorsement from the most famous basketball player in the world and surrounded it with the names and photographs of other athletes who never agreed to appear. The same tools can

be turned on any athlete, at any level of the sport, with ease. Defendants must face the legal consequences of their intentional conduct to prevent it from being repeated.

11. Accordingly, Plaintiffs bring this action to permanently stop Defendants' misappropriation of Mr. James's name, image, and likeness, to require Defendants to correct the false impression they deliberately created, and to recover damages from Defendants' unlawful conduct.

## THE PARTIES

12. Plaintiff LeBron James is an individual domiciled in the State of New York. Mr. James is a professional basketball player who currently plays for the Philadelphia 76ers of the NBA. He commutes to Philadelphia from his residence in New York City.

13. Plaintiff LBJ Trademarks, LLC is an Ohio limited liability company, with its principal place of business at 3800 Embassy Parkway, Suite 360, Akron, Ohio 44333, to which Mr. James assigned certain intellectual property rights.

14. Defendant PlayVision, Inc. is, on information and belief, a Delaware corporation with its principal place of business in San Jose, California. On information and belief, PlayVision owns and operates the Bron App, which it markets under the name "Bron," including through its Apple App Store listing titled "Bron - AI Sports Analysis," the website "askbron.ai," and the social media account @bron_app. The privacy policy for askbron.ai identifies PlayVision as the operator of Bron. On information and belief, PlayVision was founded in 2025 and participated in the Fall 2025 batch of the startup accelerator program, Y Combinator.

15. Defendant Anish Gupta is, on information and belief, an individual residing in California. Mr. Gupta is a co-founder and the Chief Executive Officer of PlayVision. On information and belief, Mr. Gupta personally conceived, approved, directed, and participated in

the wrongful conduct alleged in this Complaint, including by selecting the "Bron" name, by personally publishing the Ad on his X account, and by personally publishing subsequent videos.

16. Defendant Marc Zoghby is, on information and belief, an individual residing in California. Mr. Zoghby is a co-founder and the Chief Technology Officer of PlayVision. On information and belief, Mr. Zoghby personally directed and participated in the wrongful conduct alleged in this Complaint, including by participating in the selection of the Bron name and in the creation of the Ad, including the generation of the artificial depiction and simulated voice of Mr. James that the Ad features. According to PlayVision's Y Combinator profile, Mr. Gupta and Mr. Zoghby are PlayVision's only employees.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a) and (b), including because this action involves claims arising under the Lanham Act, 15 U.S.C. § 1125.

18. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), because those claims arise from the same common nucleus of operative facts and transactions as the federal claims such that they form part of the same case or controversy.

19. This Court has personal jurisdiction over PlayVision under N.Y. C.P.L.R. § 302(a)(1) because PlayVision transacts business within New York and Mr. James's claims arise from that business. PlayVision markets the Bron App to consumers throughout the United States, including in New York, and, on information and belief, has made the Bron App available for download by New York residents, has sold "Bron Pro" subscriptions—priced at $29.99 per month or $249.99 per year—to New York residents, and has routed New York users to place wagers with sportsbooks and prediction markets, including operators licensed by the New York State Gaming Commission. As of September 2026, New York is the number one legal sports-betting market in

the United States, and the Bron App is designed to serve it. The "Bron" name appears in every one of those New York transactions, and the Ad was created and disseminated to drive downloads and subscriptions from consumers, including New York consumers.

20. This Court also has personal jurisdiction over PlayVision under N.Y. C.P.L.R. § 302(a)(3)(ii). PlayVision committed tortious acts outside New York—including creating the Ad and adopting the "Bron" name—that caused injury within New York—including by disseminating the Ad to, and deceiving, consumers in New York and by injuring Mr. James's goodwill and commercial relationships in New York. As a resident of New York, Mr. James personally experiences that harm directly in New York. Mr. James's residency in New York has been widely reported. Therefore, PlayVision expected or should reasonably have expected its actions to have consequences in New York, and on information and belief, PlayVision derives substantial revenue from interstate commerce.

21. This Court has personal jurisdiction over Defendants Gupta and Zoghby under N.Y. C.P.L.R. § 302(a) because each personally directed, controlled, and participated in the conduct described above, including PlayVision's New York business and the creation and dissemination of the Ad. In addition, on information and belief, PlayVision acted for Defendant Gupta's and Defendant Zoghby's benefit, with their knowledge and consent, and under their control.

22. The exercise of personal jurisdiction over each Defendant comports with due process. Defendants purposefully directed the Bron App, the "Bron" name, and the Ad at a nationwide market of sports bettors that includes New York, and the injuries alleged herein arise directly from those forum-directed activities. And by selecting Mr. James's image and the "Bron" name, Defendants specifically targeted Mr. James, a well-known resident of New York, making it even more certain that their forum-directed activities would cause injury in New York.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including but not limited to Defendants' unauthorized misappropriation of Mr. James's name, image, and likeness to create the Ad; Defendants' acts of false endorsement, sponsorship, and association as to Mr. James in connection with the creation and use of the "Bron" name in connection with the Bron App; and the dissemination of the Ad to, and the marketing of the Bron App and sale of Bron App subscriptions to, consumers in this District.

## FACTUAL ALLEGATIONS

### A. The Famous Name, Image, And Likeness Of The Athlete Known As "Bron"

24. Mr. James's basketball roots trace back to his home state of Ohio, where he was drafted by the Cleveland Cavaliers as the first overall draft pick in the 2003 NBA Draft directly out of high school. After more than two decades in the NBA—with the Cleveland Cavaliers, the Miami Heat, the Los Angeles Lakers, and now the Philadelphia 76ers—Mr. James has shattered records and become one of the most decorated athletes in the history of professional sports. He has won four NBA championships, four NBA MVP awards, and four Finals MVP awards. He has been named an NBA All-Star twenty-two times and won three Olympic gold medals. Mr. James is the NBA's all-time leading scorer and, as of Monday, November 16, 2026, ranked third on the NBA's all-time career assists list.

25. Mr. James's reach and public persona extend far beyond the basketball court. He is an entrepreneur, a media producer, an actor, and a philanthropist whose LeBron James Family Foundation founded the I PROMISE School in his hometown of Akron, Ohio. He has more than 150 million followers on Instagram and more than 55 million followers on X, and his activities on and off the court are covered daily by sports, business, and entertainment media around the world.

When Mr. James appeared at his first 76ers media day in September 2026, the Associated Press described him as "the most famous basketball player in the world."

26. Mr. James is also closely identified with jersey No. 23, and has been for decades. He wore No. 23 both as a youth player and at St. Vincent–St. Mary High School in Akron, Ohio. There, major sportswear brand Adidas outfitted him in apparel monogrammed "LJ 23." Mr. James has gone on to wear No. 23 for most of his NBA career, including with the Cleveland Cavaliers, the Los Angeles Lakers, and now with the Philadelphia 76ers.

27. For more than two decades, the public has known Mr. James by the nickname "Bron," a shortened, familiar form of "LeBron." Mr. James was known as "Bron" long before he played a single NBA game, with its public use to identify Mr. James dating back at least as far as a December 2002 *ESPN Magazine* profile of then-high-school senior Mr. James, which quoted his coach as saying "everyone expects Bron to go right into the NBA and dominate" and introduced one of Mr. James's quotes with the words "Bron says." When *Sports Illustrated* previewed Mr. James's NBA debut in October 2003, it concluded its discussion of Mr. James's relationship with his new head coach by stating that "Bron" was in the new coach's hands.

28. Since then, Mr. James has only continued to build up recognition and goodwill in his "Bron" name, and the nickname has continued to grow in popularity. Sportswriters, broadcasters, teammates, and fans use "Bron" interchangeably with "LeBron" to refer to Mr. James—and so does the NBA itself. For example, on September 28, 2026, the NBA's official X account introduced the 76ers' new starting lineup—which included Mr. James—by announcing: "MAXEY. VJ. JB. BRON. EMBIID." That post was viewed more than 4.5 million times.




***@NBA post on X, September 28, 2026***

29. Fans do the same. At 76ers games, fans display homemade signs that play on the nickname. At a recent 76ers game, a fan displayed a handmade sign with the message: "UN-BRON-LIEVABLE." A picture of the sign is included below:




***Fan sign, Philadelphia 76ers game***
***November 11, 2026 (cropped)***

30. Mr. James uses "Bron" himself, and he has done so for more than two decades. For example, during the 2003–04 season, Upper Deck, a trading card company, issued a Signature Edition "Bron" card as part of its "Famous Nicknames" collection. Mr. James autographed the card "Bron" and "23," his jersey number.




***2003–04 Upper Deck SP Signature Edition "Famous Nicknames" card (No. 14 of 25) autographed by Mr. James***

31. In a March 2026 *ESPN* article, Mr. James described his younger self as "Miami Bron" and "invincible Bron."

32. In October 2026, after a video of Mr. James bouncing teammate Tyrese Maxey's infant daughter on his knee during the 76ers' preseason Blue and White Scrimmage went viral, Mr. James reposted the video to his Instagram story with his own caption, which began: "Uncle Bron on babysitting duty!"

33. On his basketball podcast, *Mind the Game*, Mr. James repeatedly refers to himself as "Bron," including in a video featuring a sponsored ad in connection with Mr. James's partnership with DraftKings. Images showcasing Mr. James's use of "Bron" on the *Mind the Game* podcast are below. The *Mind the Game* podcast has nearly 1 million subscribers on YouTube.










34. As shown below, on his lifestyle podcast, *The Shop*, Mr. James similarly refers to himself as "Bron." *The Shop* podcast has nearly 200,000 subscribers on YouTube.




35. In short, viewers, fans, the media, and the general public all know and understand that "Bron" refers to Mr. James and no one else.

36. Equally well known are Mr. James's distinctive voice, physique, image, and likeness. Mr. James has starred in or been featured in several films and television series throughout his career, including the documentary series *I Promise*, *Legacy: The True Story of the LA Lakers,*

*Greatness Code, Starting 5*, *Court of Gold*, and the movie *Entourage*. He was featured in episodes of popular American cartoons, *SpongeBob SquarePants* and *The Simpsons.*

37. Mr. James's voice is also widely recognizable to fans. Outside of his courtside interviews, Mr. James's voice can be heard on his two podcasts, *Mind the Game* and *The Shop*, which are available on streaming platforms such as Spotify and Apple Podcasts. In addition, Mr. James has been featured on popular sports radio segments and third-party podcasts, including the podcast *360 with Speedy*, which received over 1 million views. Mr. James has appeared on several talk shows, including an episode of *Jimmy Kimmel Live* hosted by Arsenio Hall that received over 3.4 million views. Even those who listen to these radio segments, Mr. James's podcasts, and third-party podcasts *without* watching any video are accustomed to recognizing Mr. James's voice alone.

38. As detailed below, before launching the Bron App or releasing the Ad, Defendants knew and understood that Mr. James's name, voice, physique, image, and likeness, including when presented alongside his iconic No. 23 jersey number, were readily associated with Mr. James. While Defendants depicted an AI version of Mr. James in the Ad principally from behind, they gave that AI version Mr. James's frame, put his "Bron" name and his number across its back, and gave it his voice—and even his tattoos—knowing that viewers would instantly recognize the player they were seeing and hearing as Mr. James.

**B. Mr. James Carefully Controls The Commercial Use Of His Name And Identity**

39. Mr. James's endorsement is highly sought after. He has maintained long-term relationships with a select group of leading brands, including Nike, which has sold LEBRON-branded signature footwear and apparel since 2003, and which entered into a lifetime partnership with Mr. James in 2015. Companies pay substantial sums for the right to associate their products with Mr. James because consumers trust him and because his association confers instant credibility and attention.

40. That value depends on control. Mr. James carefully vets the companies with which he associates, declines far more opportunities than he accepts, and protects his name, nicknames, image, likeness, and voice against unauthorized use. Mr. James has policed unauthorized commercial uses of his identity since before his professional career began: by the time he played his first NBA game in 2003, his counsel had already pursued more than 1,000 unauthorized uses of his name and image.

41. Mr. James has been especially careful in the sports-betting and prediction-market space. From January 2024 until the summer of 2026, he served as a brand ambassador for DraftKings. In September 2026, he entered into an exclusive endorsement relationship with Polymarket, a prediction-market platform. Polymarket itself has publicly described the arrangement as an "exclusive partnership." Consistent with NBA rules, Mr. James's relationships in this space have been structured so that he does not promote wagering on NBA games; his DraftKings and Polymarket partnerships, for example, have each focused on football, not basketball.

42. The integrity of NBA competition—and the public's confidence that players are not betting on the games they play—is of paramount importance to the league, its players, and its fans. For that reason, the NBA prohibits its players from wagering on NBA games. As a result, NBA players may endorse sports-betting companies only where the endorsement does not involve the NBA, and, according to published reports, players may not promote NBA-related event contracts on prediction markets. In recent years, the NBA has imposed its most severe sanctions, including a lifetime ban, on players found to have bet on NBA games. Federal prosecutors have brought criminal charges against players for NBA-related betting schemes, and several players

have been indicted. Any suggestion that an active NBA player is betting on NBA games is therefore far from a trivial matter, and it should not be used for clicks and views.

### C. Mr. James Has Valid, Protectable, And Enforceable Rights In His Widely Known Name, Bron

43. Mr. James owns valid, protectable, and enforceable common-law rights in his name "Bron," as well as his first name "LeBron" (collectively, the "BRON Marks"), as designations identifying Mr. James as the source and/or sponsor of the goods, services, and commercial activities that he offers, sponsors, endorses, or approves.

44. In addition to their inherent distinctiveness, including functioning as his own name, the BRON Marks have acquired distinctiveness through more than two decades of continuous use in commerce, extensive advertising and promotion, and widespread unsolicited media coverage. Those uses span, among other things, footwear, apparel, consumer software, and digital goods.

45. For example, Mr. James's branded signature footwear has been sold continuously since 2003, in a line that now includes twenty-three numbered signature models as well as the LeBron Soldier, LeBron Witness, and LeBron NXXT Gen lines. Branded apparel has been sold both alone and in collaboration with other famous brands, including Liverpool Football Club, whose Liverpool FC x LeBron collections in 2023 and 2024 included soccer and basketball jerseys, hoodies, shorts, and long-sleeve tops. In 2014, Mr. James and Samsung launched a mobile application branded "LeBron," which offered users exclusive content and tracked Mr. James's statistics, schedule, and game results during the NBA playoffs. In 2021, Epic Games began selling "LeBron James" Outfits in its Fortnite video game, which players purchase with in-game currency bought with real money.

46. These uses also include use of the designation "Bron" specifically in connection with Mr. James. For example, as detailed above, Upper Deck issued a "Famous Nicknames"

trading card bearing the BRON designation, which Mr. James autographed "Bron." Mr. James's basketball podcast, *Mind the Game*, produced by Uninterrupted, the media company Mr. James co-founded, regularly promotes its content under the designation "Bron," with segments titled "BRON remembers" and "BRON AND AR BREAK DOWN THEIR VIRAL CLIP," and a sponsored segment, "presented by @DraftKings," promoting "Bron sound[ing] off about why Hali's playoff run was bigger than basketball."

47. The BRON Marks are widely recognized by the general consuming public of the United States as designations of Mr. James and of goods and services associated with him.

**D. Defendants' Willful And Bad-Faith Trading On Mr. James's Name, Image, And Likeness To Deceive Consumers**

48. On information and belief, Mr. Gupta and Mr. Zoghby founded PlayVision in 2025. PlayVision initially described itself as an AI film-analysis tool for basketball teams—"AI Moneyball for Sports." On information and belief, Mr. Gupta, a graduate of the University of California, Berkeley, whose prior experience includes work with the university's football program, is familiar with prominent athletes, including Mr. James, and was familiar with Mr. James before he co-founded PlayVision.

49. On information and belief, in the spring of 2026, PlayVision had pivoted from team analytics to consumer sports betting and had begun operating a sports-betting app under the name "Bron," *i.e.*, the Bron App. On information and belief, Defendants' Ad debuted in or around November 4, 2026, when Defendants formally launched the app's marketing campaign. Since then, Defendants have marketed the Bron App as "ChatGPT for Sports Betting" and, more recently, as "the TikTok for Sports Betting."

50. "Bron" has no ordinary English meaning, and it bears no relation to the names of PlayVision's founders, to the PlayVision name, or to any technical feature of Defendants' app.

Rather, the only commonly understood meaning of "Bron"—particularly to basketball fans and sports bettors, *i.e.*, the consumers Defendants sought to reach—is as a reference to Mr. James. And when PlayVision pivoted from team analytics to consumer sports betting, Mr. James was at that time a brand ambassador for DraftKings, another sports betting app. On information and belief, Defendants, whose original product was built around analyzing basketball, knew all of this, and they intentionally chose the name "Bron" for their new sports-betting app precisely because it leveraged Mr. James's name, reputation, and brand.

51. The Bron App presents users with a scrollable feed of recommended wagers drawn from more than 150 sportsbooks and prediction markets and allows users to place those wagers automatically on third-party platforms. The app is free to download, but Defendants monetize it by selling a "Bron Pro" subscription for $29.99 per month or $249.99 per year, which includes "prediction market integration."

52. For a new and unknown betting app, the most valuable commodities are attention and credibility. Defendants' revenue depends on persuading consumers to download the Bron App, to trust its recommendations, to pay for a subscription, and to place wagers through it. An association with Mr. James—the most famous basketball player in the world, and a publicly known endorser of sports-betting and prediction-market platforms—would supply exactly that attention and credibility.

53. Defendants secured that attention and credibility by using the name "Bron"—the nickname by which fans, the media, and the NBA all refer to Mr. James and the nickname Mr. James himself has publicly adopted. In the context of a sports-betting app oriented toward basketball and other professional sports, "Bron" points to one person: Mr. James. On information and belief, Defendants selected the name "Bron" precisely to evoke Mr. James and to trade on his

fame and goodwill. Defendants' Ad removes any doubt: to introduce their brand name to the public, Defendants put it on the back of a No. 23 basketball jersey worn by an AI-generated version of Mr. James.

**E. The Ad Appropriates Mr. James's Identity—Including His Name, Image, And Likeness—To Deceptively Market And Sell The Bron App**

54. On November 4, 2026, Mr. Gupta posted the Ad to his X account with the caption: "Meet Bron: The TikTok for Sports Betting". In follow-up posts, Mr. Gupta urged viewers to download Bron from the App Store and to try Bron Pro free for seven days. On information and belief, Defendants also published the Ad on the Bron App's Instagram account.

55. The Ad features an AI-generated version of Mr. James (the "AI-Generated James"). The AI-Generated James sits in an NBA-style locker room, apparently before a game, wearing a basketball jersey with his nickname, "Bron," printed across the back, right above the number 23. The AI-Generated James, shown principally from behind, replicates Mr. James's distinctive build, stature, complexion, and head and hair profile. The AI-Generated James replicates Mr. James's physical features, down to his tattoos: like Mr. James, the figure has script lettering on the back of the right arm above the elbow and tattoos covering the forearm. A side-by-side comparison of Mr. James and the AI-Generated James is in **Table 1** below. Further, in the Ad, the AI-Generated James speaks with Mr. James's voice which, on information and belief, was made possible through synthesized recordings of Mr. James's voice.

| Table 1 | |
|---|---|
| **LeBron James** | **The AI-Generated James (the Ad)** |
|   |   |

56. Defendants use BRON throughout the video, and parts of the Ad are set in New York. In one scene, a rider on what appears to be a New York City subway car, stopped at a station marked "14 Street," wears a cap bearing the "Bron" name while scrolling on his phone. Another scene spells out "WHERE IS BRON?" in lights across a nighttime image of the United States. Another frame displays the "BRON" name and logo alongside the tagline "Scroll to bet." and a "Download on the App Store" button. Still images from the Ad are reproduced below.




***Still image from the Ad***



***Still image from the Ad***



***Still image from the Ad***

57. In the Ad, the AI-Generated James holds a phone, and using the phone he scrolls through the Bron App's feed of available player prop bets for various NBA players, including Devin Booker, Donovan Mitchell, Giannis Antetokounmpo, and Luka Dončić. The figure then stops on a photograph of Phoenix Suns forward Dillon Brooks and says, in Mr. James's voice, "Dillon Brooks? On Kalshi? Hell nah." Kalshi is a prediction-market platform and a direct competitor of Polymarket. Still images from the Ad are reproduced below.




***Still image from the Ad***




***Still image from the Ad***

58. Every element of the Ad was designed to present the AI-Generated James as Mr. James, and to communicate that Mr. James uses, endorses, and/or is affiliated with the Bron App, including: (i) the nickname "Bron" on the jersey; (ii) the No. 23; (iii) the figure's physical appearance, including his physique and tattoos; (iv) Mr. James's voice; (v) the NBA locker-room setting; and (vi) the reference to Mr. James's well-known on-court rival, Mr. Brooks. Each element reinforced the others, and together they left no room for doubt about whom the Ad depicted. And the Ad is in service of a sports-betting app called "Bron," which alone conveys the false impression that Mr. James endorses, sponsors, or is associated or affiliated with Defendants.

59. The Ad contained no disclaimer stating that Mr. James was not affiliated with Defendants or the Bron App and that he did not endorse the product, and contained no disclosure

that the figure had been artificially generated. Nor did the Ad contain any notice or message encouraging viewers to gamble responsibly.

60. The Ad also exploits other real athletes. It displays the names and photographs of active NBA and NFL players—including Dillon Brooks, Devin Booker, Giannis Antetokounmpo, Luka Dončić, Christian McCaffrey, and Jayden Daniels—as the subjects of prop bets in Defendants' app feed, turning those players' identities and performances into advertising for Defendants' betting product. On information and belief, none of those athletes consented to Defendants' use of their names or images. At least one of them, Luka Dončić, has likewise sent Defendants a demand to cease using his image.

61. The Ad spread quickly. It was viewed approximately one million times on X within roughly a day of being posted, and it was rebroadcast, reposted, and discussed by national media outlets and by social media users, many of whom have republished the Ad itself. The Ad continues to circulate online.

### F. The False And Misleading Ad Has Caused Confusion And Portrayed Mr. James In A Negative Light

62. The Ad falsely conveyed to its viewers that Mr. James uses the Bron App, endorses the Bron App, and/or is affiliated with, sponsors, has approved, or has an ownership interest in Defendants and their app. Viewers, commentators, and the media immediately understood the AI-Generated James to be a depiction of Mr. James, and they widely reported the Ad as one that used Mr. James's name and likeness. Social media users who viewed the Ad expressed the belief that Mr. James was involved with or had endorsed the Bron App. In response to an ESPN Facebook post discussing the Ad, commenters stated: "I bet LeBron AI is not good," and "[t]hey should've called it GOAT AI, so no one would get confused with LeBron."

63. The Ad also portrays Mr. James in a negative light because it depicts fans searching for Mr. James while he is in the locker room gambling on NBA players. This is at odds with Mr. James's well-known and highly televised routine of being on time for games and being one of the first people out on the court.

64. The Ad also falsely conveyed that Mr. James bets on professional basketball. It depicts the AI-Generated James in an NBA locker room before a game, browsing player prop markets on professional athletes and passing judgment on a wager tied to a fellow NBA player. In another scene, the AI-Generated James walks across an arena floor in front of a crowd as floating graphics display winning wagers—"+150$" on Kalshi and "+341$" on DraftKings—beside the players on the court. That depiction falsely communicates that Mr. James wagers, or considers wagering, on NBA games and NBA player performance—conduct that NBA rules prohibit. Media coverage of the Ad recognized precisely that implication. That false message is especially damaging in light of the heightened scrutiny of NBA-related gambling described above.



***Still image from the Ad***

65. The Ad's reference to Kalshi compounds the harm to Mr. James by falsely suggesting that Mr. James uses a prediction-market platform that competes directly with Polymarket, Mr. James's exclusive partner in that space—thereby threatening the integrity and value of that relationship.

66. The Ad does not comply with the requirement of New York law that any advertisement featuring an artificially generated "synthetic performer" disclose that fact conspicuously. N.Y. Gen. Bus. Law § 396-b.

**G. Defendants Are Acting Willfully And In Bad Faith, And Refuse To Cease Their Unauthorized Use Of Mr. James's Name, Image, And Likeness**

67. Defendants knew exactly what they were doing. Defendants know of Mr. James. And, on information and belief, Defendants, with that knowledge, chose to create an advertisement featuring Mr. James's name, Mr. James's basketball jersey number, Mr. James's tattoos, Mr. James's silhouette, and Mr. James's voice. Defendants then placed the AI-Generated James in its most recognizable context, an NBA locker room. Then Defendants scripted the Ad such that the AI-Generated James mocked one of Mr. James's on-court rivals. The resulting video was the Ad, and Defendants made that Ad the centerpiece of their marketing launch. Defendants did all of this without seeking, let alone obtaining, Mr. James's consent, and on information and belief, with full knowledge that Mr. James has commercial relationships in the sports-betting and prediction-market space—pre-existing relationships which Defendants knew would make the Ad that much more believable.

68. Defendants did not seek—let alone obtain—permission from Mr. James to use his name, voice, jersey number, image, or likeness in connection with their nascent sports-betting app they named "Bron." Nor did Defendants pay the tens of millions of dollars that Mr. James regularly commands in such circumstances. Their decision to appropriate Mr. James's name as the name for their "Bron" sports-betting app was a deliberate attempt to trade on his decades of name recognition and goodwill in connection with basketball specifically, and sporting success generally. Their decision to launch an advertisement for their Bron App that features an AI-generated version of Mr. James bearing his name, appearance, voice, and jersey number—all in

service of confusing the public into falsely believing that Mr. James sponsored, endorsed, or otherwise affiliated himself with Defendants' Bron App—was a willful, bad-faith tactic to leverage Mr. James's name, reputation, and carefully curated association with sports betting, for a new and unknown product.

69. PlayVision is, in substance, Mr. Gupta and Mr. Zoghby. The company lists a team of two people—its two founders—and no other employees. Mr. Gupta is PlayVision's chief executive and the public face of the Bron App. He describes himself as "CEO @ Bron." He personally published the Ad on his own X account, introducing it as "Meet Bron: The TikTok for Sports Betting." Mr. Zoghby is PlayVision's co-founder and chief technology officer. Before founding PlayVision, he worked as an artificial-intelligence researcher at the Mayo Clinic and studied electrical engineering and computer science at the University of California, Berkeley. At PlayVision, he has publicly described building computer-vision systems that analyze basketball game footage, including systems that identify individual players by their jersey numbers. Mr. Zoghby thus knows that a basketball player's number identifies the player.

70. The decisions at issue in this action were not the product of some corporate process removed from Mr. Gupta and Mr. Zoghby; rather, they were personally made by Mr. Gupta and Mr. Zoghby. On information and belief, Mr. Gupta and Mr. Zoghby together: (i) chose the Bron App's name; (ii) personally commissioned, directed, and approved the use of Mr. James's name, image, and likeness in connection with the Bron App and the Ad (including by using artificial-intelligence tools to generate the depiction of Mr. James and his voice); (iii) decided to release the Ad; and, (iv) after receiving a letter from Mr. James's counsel demanding that they cease use of his name, image, and likeness, decided to continue operating and marketing the app under the "Bron" name anyway.

71. On information and belief, Mr. Gupta and Mr. Zoghby each knew that he, and PlayVision, did not first obtain Mr. James's permission to use his name, image, or likeness in connection with naming and promoting their Bron App but did so anyway. On information and belief, Mr. Gupta and Mr. Zoghby likewise knew that Mr. James regularly commands fees of tens of millions of dollars for his endorsement of the select products with which he chooses to associate. Mr. Gupta and Mr. Zoghby each has control and authority over the conduct alleged herein, and each has a direct financial interest in the success of the Bron App. Each thus was a moving, active, and conscious force in the misconduct alleged herein.

72. On information and belief, Defendants anticipated, and intended, that their unauthorized use of Mr. James's identity would provoke a public response from Mr. James that would generate still more free publicity for the Bron App. Defendants thus sought to profit from Mr. James's identity twice: once through the Ad itself, and again through the controversy the Ad was designed to create. Defendants' latest post underscores that Defendants' entire marketing campaign has been in bad faith, referencing the public backlash against their Ad and daring Mr. James to sue. Defendants are not winding down their misconduct. They are milking it, stringing out the controversy one video teaser at a time for as long as it keeps the Bron App in the headlines.

73. The history of the Bron App is consistent with that design. On information and belief, Defendants operated the app under the Bron name for months without attracting meaningful public attention. Rather than build awareness for their product through legitimate means, Defendants turned to Mr. James's identity: they made an AI depiction of Mr. James the centerpiece of the app's launch video and released it from Mr. Gupta's personal X account, where it was viewed approximately one million times.

74. On information and belief, Defendants designed the Ad to maximize the likelihood of a public dispute. Defendants did not merely allude to Mr. James. They placed his nickname and number on the figure's back, gave it his voice, had it dismiss his best-known on-court rival, and surrounded it with the names and photographs of other prominent athletes—at least one of whom, Luka Dončić, also responded with a cease-and-desist letter. On information and belief, Defendants—sophisticated founders backed by a leading startup accelerator—understood that Mr. James would object publicly to such a use, that his objection would itself become news, and that the resulting coverage would drive downloads of, and subscriptions to, the Bron App. On information and belief, Defendants calculated that the value of that attention would exceed the cost of any legal consequences, and they treated the violation of Mr. James's rights as a marketing expense.

75. On November 5, 2026, Mr. James's counsel sent PlayVision, Defendant Gupta, and Defendant Zoghby a demand that they immediately cease and desist all use of Mr. James's name, image, and likeness in connection with the Bron App. The letter specifically informed Defendants that their unauthorized use of Mr. James's name, nickname, likeness, image, persona, and other identifying attributes—including the use of "Bron" as the name of their app—violated Mr. James's rights, and demanded that by 5:30 p.m. that day Defendants: (i) permanently cease all such uses, including all references to "BRON" in Defendants' company and product names; (ii) notify in writing every person who had placed a bet through Defendants' platforms that Mr. James is not associated with Defendants, and provide copies of those notices together with an accounting of the amounts wagered and Defendants' resulting revenue; and (iii) provide written assurances of compliance.

76. At 7:55 p.m. on November 5, 2026, Defendant Gupta responded to the letter by email to Mr. James's counsel. He represented that Defendants had "removed the materials," that Defendants were "in the process of changing the name of our app," and that the app "does not allow betting on the platform, only recommendations." The Ad was removed from Defendant Gupta's X account and from Defendants' Instagram account. By then, however, the Ad had already been viewed approximately one million times and been widely republished; today it remains available online through third-party reposts that Defendants' own conduct caused. Removal of the Ad from their own social media accounts is the only demand with which Defendants have complied. As of the date of this Complaint, Defendants have not notified the Bron App's users that Mr. James has no affiliation with them, have not provided the accounting Mr. James requested, have not provided the written assurances Mr. James demanded, and have not changed the name of their app.

77. On November 6, 2026, Defendant Gupta posted a new video in which the company states: "the Internet was loud, and we heard you. It's time for a new name." The video cuts off without revealing any new name. Neither Mr. Gupta's November 5 email nor the November 6 video identified a new name, a date by which Defendants would adopt one, or any commitment not to resume using Mr. James's identity.

78. On November 16, 2026, Mr. Gupta posted a new promotional video on LinkedIn that references the public backlash against Defendants' AI-generated Ad as still more content for the Bron App. The post promises a new name in the coming days and jokes about a potential lawsuit while featuring a crowd chanting "Bron AI." The official account for the Bron App reposted this video.

79. As of the date of this Complaint, Defendants continue to market, distribute, and sell the Bron App under the name "Bron," including through the Apple App Store listing "Bron - AI Sports Analysis." They continue to operate the @bron_app Instagram account and the askbron.ai domain. And they continue to accept "Bron Pro" subscriptions. Defendants' website continues to tell consumers that "[j]ust 1 month of Bron can transform your bankroll." And Defendants have used the demand that they stop trading off the "Bron" name as a way to exploit the controversy Defendants created by misappropriating Mr. James's name, image, likeness, and persona.

80. On information and belief, Defendants obtained the attention they sought. The dispute generated national coverage of the Bron App, including descriptions of its features and its subscription prices, and trade press reported that the app had received a "publicity boost" from Mr. James's cease-and-desist letter. Commentators openly questioned whether provoking Mr. James's response "may have been the point." Defendants' minimal response to legal demands to cease the offending conduct, their teaser promising "a new name" without delivering one, and their continued use of the BRON name are consistent with a strategy of prolonging the controversy for as long as it continues to generate attention for the Bron App. Defendants' conduct was willful, deliberate, and in bad faith.

81. Defendants' partial removal of certain postings of the Ad does not protect Mr. James from continuing and future harm. Defendants retain the Ad and the means to republish it or to create new advertisements using Mr. James's identity at will. They continue to use the BRON name. Their statements promising to change that name are unenforceable social media teasers. And their conduct to date—launching their product by appropriating Mr. James's identity and then exploiting the resulting controversy—demonstrates a willingness to resume that conduct whenever it suits them. Only an injunction issued and enforced by this Court will ensure that Defendants do

not resume use of the "Bron" name, the Ad, or any other advertisement or material using Mr. James's name, nickname, image, likeness, or voice.

**H. Defendants' Conduct Has Caused And Will Continue To Cause Irreparable Harm**

82. Defendants' conduct has deprived Mr. James of control over his own identity and reputation, falsely associated him with an unvetted betting product and with betting on NBA games, and confused the consuming public. Those injuries cannot be fully measured or compensated by money damages.

83. Defendants' conduct has also caused Mr. James monetary harm, including the loss of the fair market value of a license to use his name, nickname, likeness, and voice to promote a sports-betting product, and it has unjustly enriched Defendants, including through downloads, subscriptions, investments, and publicity attributable to their unauthorized use of Mr. James's identity.

84. Defendants have given no indication that they will stop. They removed the advertisement while keeping the Bron name and teasing a rebrand that has not happened. Absent an injunction, nothing prevents Defendants from returning to Mr. James's identity, or from turning the same tools on another athlete.

## CAUSES OF ACTION

### COUNT I
### FALSE ENDORSEMENT, FALSE ASSOCIATION, AND FALSE DESIGNATION OF ORIGIN
### (15 U.S.C. § 1125(a)(1)(A))
*(by Plaintiffs against all Defendants)*

85. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

86. Mr. James's name, his nickname "Bron," his likeness (including his build, his tattoos, and his distinctive physical presentation), his voice, and the combination of the "Bron"

nickname and the No. 23 on a basketball jersey function as marks identifying Mr. James and the goods, services, and commercial activities that he endorses, sponsors, and approves.

87. Mr. James's personality rights—including in his name "Bron," his image, his likeness, his voice, and his persona, including in connection with his iconic No. 23 jersey—are exceptionally strong. Mr. James is instantly recognizable to virtually every member of the relevant consuming public—including sports fans, sports bettors, and users and prospective users of sports-betting and prediction-market apps—as well as to the general public. The Associated Press has described him as "the most famous basketball player in the world," and fans, the media, the NBA, and Mr. James himself all use "Bron" to refer to him. Defendants did not use an anonymous image that consumers would understand as a model lending her face to a product for a fee; instead, they used a figure designed and intended to be identified as Mr. James by name, number, physique, tattoos, and voice, and the public and the press identified it as Mr. James immediately.

88. Without Mr. James's consent, Defendants have used in commerce, on and in connection with the advertising, promotion, offering for sale, and sale of the Bron App and Bron Pro subscriptions, words, terms, names, symbols, and devices, and false designations of origin, including: (i) the name "Bron" as the name of Defendants' app, brand, and related accounts; and (ii) the Ad's depiction of the AI-Generated James, including the "Bron" nickname, the No. 23, the figure's appearance, and the simulated voice of Mr. James.

89. Mr. James has never endorsed, sponsored, or approved Defendants, the Bron App, Bron Pro subscriptions, or the Ad, and Plaintiffs have not authorized Defendants' use for any purpose. Defendants' use is therefore wholly unauthorized.

90. Defendants' use of Mr. James's name, image, and likeness is likely to cause confusion, to cause mistake, and/or to deceive as to the affiliation, connection, or association of

Defendants with Mr. James, and as to the origin, sponsorship, or approval of Defendants' goods, services, and commercial activities by Mr. James. Among other things, it is likely to lead consumers to falsely believe that Mr. James uses and endorses the Bron App, that he sponsored or approved the Ad, that he has an ownership or other financial interest in PlayVision or the Bron App, and/or that the Bron App is his product.

91. Defendants' use of the "Bron" name in connection with the Bron App and Mr. James's name, image, likeness, and persona in Defendants' Ad, each independently gives rise to a likelihood of confusion as to affiliation, connection, association, origin, sponsorship, or approval, and each reinforces the other. Every consumer who encountered the Ad was taught that "Bron" means LeBron James, and every subsequent encounter with the BRON name trades on that lesson.

92. Confusion is likely under each of the relevant factors: (i) strength—Mr. James's identity is among the most recognizable in the world, and "Bron" and the No. 23 identify Mr. James instantly; (ii) similarity—Defendants used Mr. James's actual nickname, his jersey number, and a figure and voice designed to replicate his own, and placed his nickname where a player's surname belongs; (iii) proximity—Mr. James has endorsed sports-betting and prediction-market platforms, including DraftKings and Polymarket, so a sports-betting app sits squarely within the market in which consumers already encounter his endorsements; (iv) bridging the gap—there is no gap to bridge, because Mr. James is already active in that market; (v) actual confusion—social media users immediately identified the AI-generated version as Mr. James, and discussed "gambling" with Mr. James; (vi) bad faith—Defendants deliberately chose Mr. James's nickname, number, appearance, and voice, and continued to use the BRON name after receiving Mr. James's cease-and-desist letter, with the intent to trade upon the goodwill in Mr. James's name, image, likeness, and personality associated with his brand image; (vii) quality—the Bron App is an

unvetted gambling-related product, and the Ad displayed prop lines that appear to be fabricated, so any association with it threatens Mr. James's reputation; and (viii) consumer sophistication—consumers who encounter short-form social media advertising for a free app exercise little care. Taken together, the overall impression is one of a likelihood of false endorsement, false association, and confusion as to source or sponsorship.

93. The Ad is commercial advertising that proposes a commercial transaction—the download of and subscription to the Bron App. It is not parody, commentary, news reporting, or any other expressive work, and Defendants' use is neither a nominative nor a descriptive use. Defendants used Mr. James's name, image, and likeness as a designation of the source, sponsorship, and endorsement of their own product. Consumers who encounter the Bron App or view the Ad are likely to mistakenly believe that Mr. James's permission or authorization was obtained for Defendants to use Mr. James's name, image, and likeness.

94. Defendants' conduct was knowing, deliberate, and willful, and was undertaken with the bad-faith intent to trade on Mr. James's goodwill and to cause confusion, mistake, and deception. Defendants have continued to use the BRON name after receiving legal demands to cease such conduct.

95. Defendants Gupta and Zoghby are personally liable for these violations because each personally authorized, directed, and participated in them and was a moving, active, and conscious force behind them.

96. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages, and Defendants have been unjustly enriched. Plaintiffs are entitled to recover Defendants' profits, actual damages, and the costs of this action, and—because

Defendants' conduct was willful and this is an exceptional case—enhanced damages and their reasonable attorneys' fees under 15 U.S.C. § 1117(a).

97. Defendants' conduct has caused and, unless enjoined, will continue to cause irreparable harm to Plaintiffs for which they have no adequate remedy at law. Plaintiffs are entitled to a rebuttable presumption of irreparable harm and to preliminary and permanent injunctive relief under 15 U.S.C. § 1116(a).

## COUNT II
## VIOLATION OF THE NEW YORK STATUTORY RIGHTS OF PRIVACY AND PUBLICITY
## (N.Y. Civil Rights Law §§ 50 and 51)
*(by Mr. James against all Defendants)*

98. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

99. Section 50 of the New York Civil Rights Law prohibits the use "for advertising purposes, or for the purposes of trade," of "the name, portrait or picture of any living person without having first obtained the written consent of such person." Section 51 provides a private right of action to "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided," including an equitable action to prevent and restrain the use, a claim for damages for any injuries sustained by reason of the use, and, where the defendant "knowingly used" the person's name, portrait, picture, or voice, exemplary damages.

100. Mr. James is a living person.

101. Defendants used Mr. James's name, portrait, picture, and voice within New York. The Ad presents the AI-Generated James—a portrait and picture of Mr. James that is recognizable as Mr. James from his build, his tattoos, his jersey number, and the setting—under his name in the form by which the public knows him, "Bron," and speaking in an AI-fabricated version of his

voice. Defendants also use the name "Bron" itself to identify, market, and sell the Bron App and Bron Pro subscriptions. Defendants made that use within New York. They disseminated the Ad to consumers in New York through X, Instagram, and other channels; set part of the Ad in what appears to be a New York City subway station; and, on information and belief, marketed and sold the Bron App and Bron Pro subscriptions to consumers in New York under the BRON name.

102. Defendants used Mr. James's name, portrait, picture, and voice for advertising purposes and for the purposes of trade—namely, to solicit downloads of the Bron App and purchases of Bron Pro subscriptions, and to draw attention to and attract investment in Defendants' business. Defendants' use bears no real relationship to any newsworthy event or matter of public interest; it is an advertisement for Defendants' product.

103. Mr. James never gave Defendants written consent—or any consent—to use his name, portrait, picture, or voice for any purpose. No one authorized by Mr. James has given Defendants such consent, and Defendants hold no license, assignment, or other right to use his name, likeness, or voice.

104. Defendants' use was knowing. Defendants deliberately created an AI-Generated James immediately recognizable as Mr. James, with full awareness that they had no consent to do so, and they continued to use his name after receiving a letter demanding they cease such conduct. Mr. James is therefore entitled to exemplary damages.

105. As a direct and proximate result of Defendants' conduct, Mr. James has suffered damages in an amount to be determined at trial, including the fair market value of the use of his name, likeness, and voice; injury to his reputation and to the value of his endorsement; and injury to his dignity and feelings from being falsely portrayed as betting on professional basketball.

106. Mr. James is entitled under N.Y. Civil Rights Law § 51 to an injunction preventing and restraining Defendants from any further use of his name, portrait, picture, or voice for advertising purposes or the purposes of trade.

**COUNT III**
**TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF THE BRON MARKS**
**(15 U.S.C. § 1125(a)(1)(A))**
*(by Plaintiffs against all Defendants)*

107. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

108. Separate and apart from the false endorsement alleged in Count I, Plaintiffs own valid and protectable rights in the BRON Marks, which are inherently distinctive, and also have acquired substantial secondary meaning long before Defendants' adoption of the BRON name.

109. Defendants' use in commerce of BRON as the name of their app and brand is likely to cause confusion, mistake, or deception as to the origin of Defendants' goods and services—that is, it is likely to cause consumers to mistakenly believe that the Bron App originates from, or is offered under license from, the source of BRON and/or LEBRON-branded goods and services.

110. Defendants' conduct constitutes trademark infringement, false designation of origin, and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

111. Defendants' conduct was knowing, deliberate, and willful, and was undertaken with the bad-faith intent to trade on Mr. James's goodwill and to cause confusion, mistake, and deception. Defendants have continued to use the BRON name after receiving legal demands to cease such conduct.

112. Defendants Gupta and Zoghby are personally liable for these violations because each personally authorized, directed, and participated in them and was a moving, active, and conscious force behind them.

113. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages, and Defendants have been unjustly enriched. Plaintiffs are entitled to recover Defendants' profits, actual damages, and the costs of this action, and—because Defendants' conduct was willful and this is an exceptional case—enhanced damages and their reasonable attorneys' fees under 15 U.S.C. § 1117(a).

114. Defendants' conduct has caused and, unless enjoined, will continue to cause irreparable harm to Plaintiffs for which they have no adequate remedy at law. Plaintiffs are entitled to a rebuttable presumption of irreparable harm and to preliminary and permanent injunctive relief under 15 U.S.C. § 1116(a).

**COUNT IV**
**DECEPTIVE ACTS AND PRACTICES**
**(N.Y. Gen. Bus. Law § 349)**
*(by Plaintiffs against all Defendants)*

115. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

116. Defendants engaged in consumer-oriented acts and practices in the conduct of business, trade, and commerce in New York. The Ad was not a private communication. It was a standardized advertisement disseminated to the public at large through social media, where it was viewed at least one million times, for the purpose of inducing members of the consuming public to download the Bron App, purchase Bron Pro subscriptions, and use the app to research and place real-money wagers. Defendants continue to market the app to the same public under the BRON name through the App Store and their website.

117. Those acts and practices were deceptive and misleading in material respects and were likely to mislead a reasonable consumer acting reasonably under the circumstances. Among other things, they (i) represented that the most famous basketball player in the world uses,

endorses, and is affiliated with the Bron App; (ii) presented an AI-Generated James without disclosing that the figure was synthetic or that Mr. James has no affiliation with Defendants; and (iii) represented that an active NBA player researches and places wagers on professional basketball through the app. A celebrity endorsement is material to a consumer's decision whether to trust a betting-research product, pay for it, and wager money on its recommendations.

118. Defendants' deception was aimed at members of the public deciding whether to download, pay for, and wager real money through a gambling-related product, and it invited them to make those decisions in reliance on a false endorsement. It exploited the identities of other real athletes, without their consent, as advertising for Defendants' betting product. It falsely portrayed an active NBA player as betting on professional basketball, undermining public confidence in the integrity of professional sports. And it presented artificially generated content to the public without the disclosure that New York law requires.

119. Plaintiffs have been injured as a direct result of Defendants' deceptive acts and practices. Because the deception operated by persuading the public that Mr. James endorses the Bron App and bets on NBA games, it has injured his reputation and goodwill and diminished the value and exclusivity of his endorsement in the sports-betting and prediction-market category.

120. Defendants acted willfully and knowingly. Plaintiffs are entitled under N.Y. Gen. Bus. Law § 349(h) to an injunction, their actual damages and an increase of that award to the extent permitted by § 349(h), and reasonable attorneys' fees.

**<u>COUNT V</u>**
**FALSE ADVERTISING**
**(15 U.S.C. § 1125(a)(1)(B))**
*(by Plaintiffs against all Defendants)*

121. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

122. The Ad is commercial advertising and promotion disseminated in interstate commerce to the relevant purchasing public.

123. The Ad misrepresents the nature, characteristics, and qualities of Defendants' goods and services. By necessary implication, through the advertised name of its product as well as its presentation of the AI-Generated James under his name, it falsely represents that: (i) the Bron App is a product that Mr. James uses, relies upon, endorses, and recommends for evaluating wagers, and that its recommendations carry his approval, when he does not; and (ii) he consented to the use of his name, image, likeness, and persona in connection with the Ad, when he did not.

124. The Ad also falsely represents that Mr. James, an active NBA player, bets on professional basketball, including on the performance of fellow NBA players. That representation is literally false, and it is material to consumers' decisions whether to download, subscribe to, and wager through the Bron App.

125. Mr. James has a commercial interest in his reputation and in the value of his endorsement that falls within the zone of interests protected by the Lanham Act, and Defendants' false advertising has proximately injured that interest. Consumers who saw the Ad were in fact deceived into believing that Mr. James uses and endorses the Bron App and bets on NBA games, as the public and press reaction alleged above shows. Mr. James's injury flows directly from that deception: it has damaged his reputation and goodwill with the public, the NBA, and prospective commercial partners; diminished the value and exclusivity of his endorsement in the sports-betting and prediction-market category, including by falsely associating him with Kalshi, a direct competitor of his exclusive partner Polymarket; and deprived him of the fee he would have commanded for any endorsement of Defendants' product.

126. Defendants' conduct was knowing, deliberate, and willful, and was undertaken in bad faith.

127. Defendants Gupta and Zoghby are personally liable for these violations because each personally authorized, directed, and participated in them and was a moving, active, and conscious force behind them.

128. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages, and Defendants have been unjustly enriched. Plaintiffs are entitled to recover Defendants' profits, actual damages, and the costs of this action, and—because Defendants' conduct was willful and this is an exceptional case—enhanced damages and their reasonable attorneys' fees under 15 U.S.C. § 1117(a).

129. Defendants' conduct has caused and, unless enjoined, will continue to cause irreparable harm to Plaintiffs for which they have no adequate remedy at law. Plaintiffs are entitled to a rebuttable presumption of irreparable harm and to preliminary and permanent injunctive relief under 15 U.S.C. § 1116(a).

**COUNT VI**
**FALSE ADVERTISING**
**(N.Y. Gen. Bus. Law §§ 350 and 350-a)**
*(by Plaintiffs against all Defendants)*

130. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

131. The Ad is advertising disseminated in New York in the conduct of Defendants' business, trade, and commerce.

132. The Ad is false and misleading in material respects, including by reason of both the representations it makes and the material facts it fails to reveal, within the meaning of N.Y. Gen. Bus. Law § 350-a(1). Among other things, the Ad falsely represents that Mr. James uses and

endorses the Bron App and that he wagers on professional basketball, and fails to disclose that the figure depicted is artificially generated and that Mr. James has no affiliation with Defendants.

133. The Ad was directed to the consuming public at large, was likely to mislead reasonable consumers acting reasonably under the circumstances, and harmed consumers and the public interest for the reasons alleged herein.

134. Plaintiffs have been injured as a direct result of the Ad. By deceiving consumers into believing that he endorses the Bron App and bets on NBA games, the Ad injured Mr. James's reputation and goodwill and diminished the value and exclusivity of Mr. James's endorsement in the sports-betting and prediction-market category. Because Defendants willfully and knowingly violated N.Y. Gen. Bus. Law § 350, Plaintiffs are entitled under N.Y. Gen. Bus. Law § 350-e to an injunction, their actual damages, such enhanced damages as § 350-e permits, and their reasonable attorneys' fees.

**COUNT VII**
**UNFAIR COMPETITION**
**(New York Common Law)**
*(by Plaintiffs against all Defendants)*

135. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

136. Mr. James has invested more than two decades of effort, skill, and expense in building the goodwill and commercial value associated with his name, nicknames, likeness, and voice, and in the BRON Marks.

137. Defendants misappropriated that goodwill and commercial value in bad faith, by adopting the "Bron" name and creating and disseminating the Ad in order to attach Mr. James's fame and credibility to their sports-betting product, in a manner likely to cause confusion and

deception as to the source, sponsorship, and approval of Defendants' goods and services and their affiliation with Mr. James.

138. Defendants' conduct constitutes unfair competition and misappropriation under the common law of the State of New York.

139. Defendants' conduct was willful, wanton, and malicious, and was undertaken in conscious disregard of Mr. James's rights, entitling Plaintiffs to punitive damages in addition to compensatory damages and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants, jointly and severally, and grant the following relief:

A. A declaration that Defendants have violated 15 U.S.C. §§ 1125(a)(1)(A) and (B); N.Y. Civil Rights Law §§ 50 and 51; N.Y. Gen. Bus. Law §§ 349, 350, and 350-a; and the common law of the State of New York;

B. A preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116, N.Y. Civil Rights Law § 51, N.Y. Gen. Bus. Law §§ 349(h) and 350-e, and the Court's inherent equitable powers, enjoining Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of the order, from:

(i) using the name or designation BRON or BRON AI, or any other name, mark, trade name, domain name, social media handle, app name, or other designation that consists of or incorporates BRON, LEBRON, KING JAMES, LBJ, or any other name or nickname of Mr. James, or any designation confusingly similar to any of them, in connection with any goods, services, or business;

(ii) using Mr. James's name, nicknames, signature, photograph, image, likeness, or voice, or any digital replica, artificially generated or simulated depiction, or imitation of any of them, including any depiction combining the nickname "Bron" or the No. 23 with other attributes evoking Mr. James, for advertising purposes or for the purposes of trade;

(iii) publishing, republishing, disseminating, or authorizing the dissemination of the Ad or any derivative, excerpt, or variation of it, or any other advertisement or promotional material using Mr. James's identity; and

(iv) representing, expressly or by implication, that Mr. James is affiliated or associated with Defendants, or that he uses, sponsors, endorses, or has approved Defendants or any of their goods, services, or commercial activities;

C. An order requiring Defendants to:

(i) remove the BRON name and all other material identified in Paragraph B above from the Bron App, all app-store listings, all websites, all social media accounts, and all other advertising and promotional materials within their possession, custody, or control;

(ii) cease use of, and transfer to Plaintiffs, the domain name askbron.ai and any other domain name or social media handle consisting of or incorporating BRON;

(iii) expressly abandon any application to register BRON or any other designation consisting of or incorporating BRON or any name or nickname of Mr. James; and

(iv) deliver up for destruction, or certify the destruction of, all materials bearing or depicting any of the foregoing;

D. An order requiring Defendants to disseminate corrective notice, in a form approved by the Court, (i) in writing to every user and subscriber of the Bron App, and (ii) through each channel in which Defendants published the Ad, stating that Mr. James has no affiliation with Defendants and has never used, sponsored, or endorsed the Bron App;

E. An order, pursuant to 15 U.S.C. § 1116(a), requiring Defendants to file with the Court and serve on Plaintiffs within thirty (30) days after the entry of any injunction a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

F. An order requiring Defendants to account for and disgorge all profits derived from their unlawful conduct, enhanced as the Court finds just, pursuant to 15 U.S.C. § 1117(a);

G. An award of compensatory damages in an amount to be determined at trial, including the fair market value of the unauthorized use of Mr. James's name, likeness, and voice, trebled pursuant to 15 U.S.C. § 1117(a) and as otherwise permitted by law, as well as corrective advertising expenses;

H. An award of exemplary damages pursuant to N.Y. Civil Rights Law § 51 and punitive damages under New York common law;

I. An award of damages pursuant to N.Y. Gen. Bus. Law §§ 349(h) and 350-e, including actual damages, statutory minimum damages, and increased damages to the extent permitted by those provisions;

J. An award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a), N.Y. Gen. Bus. Law §§ 349(h) and 350-e, and any other applicable law;

K. An award of costs and pre- and post-judgment interest at the maximum rate permitted by law;

L. An order retaining jurisdiction over this action to enforce the Court's judgment and injunction, including through contempt proceedings; and

M. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 17, 2026
New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: ____________________

Alex Spiro
Ellyde R. Thompson
Todd Anten
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com
ellydethompson@quinnemanuel.com
toddanten@quinnemanuel.com

*Attorneys for Plaintiffs LeBron James and LBJ Trademarks, LLC*